UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MORNINGSTAR HOLDING CORPORATION, a Foreign Corporation qualified to do business in Idaho, | Case No. CV-10-439-BLW |
| Plaintiff, | **ORDER ON DEFENDANTS' MOTION FOR PROTECTIVE ORDER (Dkt. 82) and PLAINTIFF'S MOTION FOR DISCOVERY (Dkt. 77)** |
| v. | |
| G2, LLC, a California Limited Liability Company, HENRY GEORGE A/K/A JOHN DOE I, and RICH DOUGLAS A/K/A JOHN DOE II, individually, and as Partners or Members of a Joint Venture, | |
| Defendants. | |

The Court has before it several simultaneously filed motions and memoranda

raising  discovery disputes:  Plaintiff's Motion for Discovery (Dkt. 77), Defendants'

Memorandum on Pending Discovery Issues (Dkt. 79), and Defendants' Motion for

Protective Order (Dkt. 82).  The Court held an evidentiary hearing on one central issue

raised in the memoranda on August 9, 2011, and took the matter under advisement.

Having considered the evidence presented, and the parties' oral and written arguments,

the Court issues the following Memoranda Decision and Order denying Defendants'

Motion for Protective Order, and granting Plaintiff's Motion for Discovery.

## PRIVILEGE CLAIM FOR E-MAIL BETWEEN G2 PARTNERS

A central issue raised in the pending motions is the applicability of the attorney-client privilege or the work product doctrine to an e-mail communication between co-defendants Henry George and Rich Douglas that had been reviewed by an attorney, Michael Josephs. The e-mail was produced by Josephs to Plaintiff Morningstar Holding Corporation during the discovery process and contains statements by Defendant George that arguably support Morningstar's claims in this litigation. Defendants contend the e-mail was an attorney-client communication that should not have been produced and ask the Court to issue a protective order regarding its use. Morningstar denies that the e-mail is protected and seeks further discovery on the contents of the communication.

## A.  Factual Background

The Court held an evidentiary hearing on August 11, 2011. Three witnesses provided testimony during the evidentiary hearing. Defendant Henry George and the attorney, Michael Josephs, testified in camera. Brett Marks, attorney for the bankruptcy trustee, testified by telephone in open court. The following factual record was developed.[1]

Defendant G2 is a company established as, in essence, a high stakes collection

---

[1] All citations to a transcript refer to the transcript of the August 11, 2011 (hereafter "Trns.").

agency.   In 2005, G2 had been retained by a number of clients to recover their investment in a high yield investment scheme involving Bank of America and other foreign banks. In August 2005, Plaintiff Morningstar Holding Corporation engaged the Defendant G2 to recover assets that Morningstar had lost as a victim of the same scheme. *(See* Dkt. 20-1, p. 2). The engagement was embodied in an Asset Recovery Agreement signed by the parties. In connection with this agreement, G2, and its operating partners, the named individual co-defendants in this action, Rich Douglas and Henry George, received a broad power of attorney which included the power to hire legal counsel on Morningstar's behalf if necessary in the recovery efforts.  *(See* Dkt. 20-2, p. 2.)

The investment fund, Sentinel Funds, and the Sentinel Partners filed for Chapter 7 bankruptcy in Florida. G2 hired a bankruptcy attorney to represent its client victims as creditors in the bankruptcy action.  In August 2006, G2 then also engaged the Josephs Jack law firm to represent the clients in initiating a civil action against Bank of America and to assist in collecting and distributing the recovery. *(See Retention Agreement*, August 10, 2006, Exh. 1001).  Michael Josephs was the responsible attorney on the matter, and believed at the time he was retained, that he could more efficiently represent the large group of G2 clients, by using G2 as the sole point of contact and communication between the law firm and the investors.  Thus, the August 2006 retention agreement with Josephs Jack provided that the law firm would "report and communicate solely with the G2 organization . . . to avoid confusion and unnecessary repetitious reports," but would

be available to the investors themselves periodically to discuss the status and progress of the case. *(See* Exh. 1001). The retention agreement also stated:

> You acknowledge we are neither your general counsel, nor that of the group, and that our acceptance of this engagement does not involve an undertaking to represent you or the groups' other interests in any matter other than that described above.

(*Id.*) It also required that G2 provide a list of the investors on whose behalf G2 was acting, and a copy of the power of attorney providing G2 with the authority to do so. *(Id.)*

Thus, initially, Josephs communicated almost exclusively with Henry George regarding the representation of Morningstar and G2's other clients regarding the distribution of the recovery. Notably, G2 and all of its clients had an aligned interest in the goal of the representation – to maximize the recovery. G2's fees were commission based; the more the clients recovered, the more G2 would receive in fees.

Two situations arose sometime in 2008 that changed the nature of the relationships between many of the stakeholders to the recovery. First, a volatile partnership dispute arose between Henry George and Rich Douglas, the G2 principals. This dispute complicated Josephs' representation of the G2 clients; G2 was acting as the client representative and "go-between" between Josephs and the clients and the G2 partners apparently could agree on little.

Second, in late 2008, several G2 clients, including Morningstar, sent a notice of their termination of the Asset Recovery Agreement and corresponding power of attorney.

(*See* Exh. 1016). Morningstar, and some of G2's other clients, contend that it was their understanding and agreement with G2 that there would be no litigation or, if a lawsuit could not be avoided, the expense of litigation would not be born by them out of their percentage of the recovery. These clients contended that they agreed to pay G2 a very high percentage of their recovery because they would not have to incur the expense of litigation. This dispute, as well as an issue related to the prioritization of certain clients recovery over other clients, lead to in-fighting between nearly all of the stakeholders regarding their individual percentage of the recovery. (*See* Exh. 2004 – George's detailed explanation to Brett Marks, attorney for bankruptcy Trustee, of various internal objections). It also provides the basis for this lawsuit.

Josephs determined at one point that he could no longer effectively represent the clients under the arrangement with G2 and withdrew from the representation altogether. (Trns. at 71, 73 - 75) In September 2008, however, a few of the prior clients, including Morningstar, re-retained Josephs directly. (Trns. at 76; *see* Exh. 1002). At some point, the Josephs Jack Ad Hoc committee was formed, which was comprised of the remaining G2 clients represented by Josephs Jack who were also creditors in the bankruptcy.

After the bankruptcy petition was filed, the bankruptcy court gave the Josephs Jack Ad Hoc Committee authority to investigate, commence and prosecute a fraudulent transfer or other avoidance action against third parties. The Court's order directed that Josephs Jack could either initiate the litigation or could jointly pursue the action with the

trustee. (Exh. 1014.) The Ad Hoc Committee hired George "to assist the Committee and the Trustee's Special Counsel, David Cimo, Esquire and The Law Firm of Genovese Joblove and Battista, P.A. (Special Counsel), in the prosecution of the multiple Adversary Complaints filed by the bankruptcy trustee." (*Id.*; *see* Trns. at 28 - 29). George expected to be paid for the work, but the payment would have to be applied for from the bankruptcy Trustee, which could have been done by either the Ad Hoc Committee itself, or George. (*See* Exh. 2003; Trns. at 28 - 29).

The clients comprising the Ad Hoc Committee, however, were not in favor of seeing G2 receive more money out of the recovery by the time payment became an issue. (Trns. at 77). They contended that G2 was responsible for the attorneys fees they were paying, and therefore was already receiving or claiming far more than its fair share based on the Asset Recovery Agreement dispute. (*Id.*)

As the litigation continued, George was "transfixed" on how and when he would be paid his post-petition fees out of the bankruptcy estate, and how the payment of those fees could be accomplished without becoming tied up in the separate dispute about the Asset Recovery Agreement. (Trns. at 77; *see e.g.*, Exhs. 2002, 2004, 20062007, 1005, 1006, 1020, 1009, 1011, 1010, 1013). George discussed his concerns with Josephs frequently, and with the bankruptcy Trustee's attorney, Brett Marks. Initially, Marks was concerned about speaking with George, a potentially represented party. (Trns. at 51). George advised Marks that he was not represented by counsel. (*Id.*)

Josephs was concerned that George's increasing agitation and frustration would jeopardize the case against Bank of America, and the total recovery, and thus proposed that the internal disputes be arbitrated privately. He told George that he would recommend private arbitration to his client, Hal McNee, President of Mornginstar. (Trns. at 84).

George indicated that he was in favor of arbitrating the Asset Recovery Agreement disputes, if Morningstar and the other clients would not object to his post-petition fee application. (*Id.*) Once Josephs was able to get Morningstar's agreement to arbitrate, however, the issue arose that George was only one part of the equation necessary to reach an agreement – his partner, Rich Douglas, would also have to agree. George was concerned about being sued by his ex-partner, and sought Josephs' advice. (Trns. at 28-29). Josephs explained to George why arbitrating the prioritization issue privately was in G2's and the other clients' best interests.

George drafted an e-mail which he intended to send to his partner. He sent the draft to Josephs for his review on May 26, 2009. (Exh. 1003). The e-mail outlines the benefits to G2 of arbitrating the prioritization issue. The e-mail pointed out that the issues and resolution would be "hidden from Bank of America's lawyers, thus avoiding any problems that could arise if the dispute went to court." (*Id.*) In conclusion, George states "[w]hat you and I can do is act in a support mode and do everything possible to help Mike create the best possible outcome for all of us." (*Id.*) Josephs reviewed the

draft e-mail and then responded to George by indicating, "you overstate my abilities but you make a compelling argument!" (*Id.*)

George informed Josephs the next day that based on Joseph's response, he sent the e-mail to Douglas the evening before. (*Id.*) This e-mail exchange is the subject of the current motions, and will be referred to as the "Disputed E-Mail."

In June 2009, arbitration was still being discussed as a possible means of resolving the internal disputes, but there was no resolution. George became increasingly upset about when he would get paid through the bankruptcy and the clients complaints about G2's fees. He wrote a lengthy e-mail to Josephs complaining about various issues and pressing him for a commitment that G2's 20% fees would be "carved out" of the distribution regardless of the remaining disputes on prioritization. (Exh. 2002). Josephs responded:

> To quote you "I am sorry I cannot be more help on this". If we resolve priority issue all is cool. We arbitrate fee issue and disburse minimum amount you could get whittled to right now there but there are so many twists and turns I cannot guess how this plays out.

(*Id.*)

On June 19, 2009, George advised Josephs that "because of a misunderstanding from the Trustee's attorney," George had failed to submit for payment post-petition fees related to parties who had settled with the Trustee. (Exh. 2003). He asked Josephs to submit an application for these fees on his behalf. Josephs personally believed that

George deserved to be paid his fees because he believed that the work George had done

for the G2 clients was exceptional.  He was willing to attempt to convince his clients not

to object to the fees, and instructed his legal assistant to "[p]lease do as soon as possible

what Henry requests." (Exh. 2003).

However, Josephs was not able to get Morningstar's consent at that time.  This

created a conflict of interest in preparing the application. On July 6, Josephs' assistant

wrote George:

> I hate to do this to you but Mike and I decided that you really need your
> own attorney.  If we file the application for you we will have a real conflict
> of interest.  Mike and I talked about it and thought that David Stern would
> be a good choice.

(Exh. 1004; *see also* Exh. 1006).

George did not retain an attorney to file the application on behalf of G2. The

record suggests that he spoke to other attorneys but felt their fees were too high. (Exh.

1007).  He did continue to share various correspondence and strategies with Josephs

wherein he demands that the bankruptcy Trustee withhold from any distribution any

money potentially owed to G2. (*See* Exhs. 2006 & 2007).  On one such occasion, Josephs

instructed George not to send the correspondence, which also detailed the parties' internal

disputes, because George was about to be deposed by Bank of America and the e-mail

would be discoverable in the litigation and detrimental to the discovery.  (*See* Exh. 2007.)

In October 2009, George again asked Josephs to file the fee application for him.

(*See* Exhs. 1005 - 1007). Joseph informed George that he was still trying to get Morningstar's consent, and in response, George threatened to sue Hal McNee, Morningstar's president. (Exh. 1005). On January 20, 2011, Josephs was able obtain his clients' consent to preparing and submitting the post-petition fee application for George in exchange for George's agreement such consent would be "without prejudice to [their] position on the asset rtecovery[sic] agreement." (Exh. 2008).

The next day, on October 22, 2009, Josephs filed an Application of Ad Hoc Committee of Unsecured Creditors Requesting Payment of Expenses Incurred in Assisting the Trustee and His Professionals in Prosecuting Fraudulent Transfer and Other Avoidance Claims wherein the Ad Hoc Committee requested payment for G2's post-petition fees. (Exh. 1018).

Two days before the hearing on the petition, Rich Douglas filed a scathing objection to George's request for fees and accused him of fraud in the application, against the clients and the court. (Trns. at 86). Josephs did not have time to investigate the allegations and withdrew the Committee's application for payment of G2's fees. (*Id.*) On December 9, 2009, he informed George that he could not pursue the application:

> Henry
> I am sorry but I cannot pursue the motion. The allegation put me in clear conflict with my clients and my obligation to the Court. As well it threaten to turn the case into a circus.
> I suggest you use this in the interpleader.
> It makes no sense to jeopardise the case by pursuing a $50,000 claim.
> Sorry for this but I must withdraw the motion.

Michael

(Exh. 1019.)

On January 4, 2010, George sent a lengthy, tempestuous response, which read in relevant parts:

> So plain and simple, Rich being a lying scumbag does not put you in a conflict position with the clients nor with the Court. . . .I need you to file the application not only because I happen to need the money right now but also because it is the right thing to do. I deserve it. . . . I have looked out for you and fought for you every time Rich was trying to fuck you over and get you removed and fired. Are you not willing to do the same for me just because there's a little heat? I think you are made of more than that. I know you are. No hiding behind the case and the clients. This is about standing up to a lunatic bully who needs to get smacked.

(Exh. 1020). Josephs responded by reiterating that his obligations to his client and the Court were greater than to George. (Exhs. 1020, 1008; Trns. at 95).

George responded again, with threats to take actions that he admitted would "result in the end of the case and that ultimately no one would get anything." (Exh. 1009). He informed Josephs that he was speaking with an attorney, and would be filing motions. He also explained:

> This case will have cost me dearly. I put in so much more work than anyone, and I mean anyone and everyone, involved in this case because of the approximately 3000 hours I spend on it, I did every hour alone. I know you and the other lawyers put in time, bu you all had staffs, and other attorneys, and secretaries and what not working for you. I had no such thing. 3000 hours of my life and what do I have to show for it? My clients all fucking me over.

(Exh. 1009). On January 11, 2010, George informed Marks that he had sent Josephs a motion asking the bankruptcy judge to rule on enforcing one of G2's contracts, but that

Josephs declined "for reasons unrelated to the motion." (Exh. 1010).  George also

informed him that he was in the process of hiring an attorney to represent G2.

On January 13, 2010, Josephs told George of a settlement with two other former

G2 clients, Lecky and Novotny, and suggested that George confirm with the clients'

attorney an agreement that any money would be held until "the G2 matters worked out."

(Exh. 2009).  Josephs also personally confirmed the agreement with the attorney by e-

mail dated January 21, 2010.  (Exh. 2010).  On that same date, George sent Josephs an e-

mail informing him that he had retained Baker & Hostetler as his counsel to represent him

in connection with a dispute involving those clients. (Exh. 1013).

George filed his application for payment in the bankruptcy, pro se, on January 22,

2010.  (Exh. 1014).  During the hearing on the application, Josephs, representing the Ad

Hoc Committee, made an impassioned plea in support of George's application for fees,

although the money would be coming out of the Ad Hoc Committee's own funds.  (Trns.

at 99 - 101; Exh. 1022, p. 3, l. 6).

On April 8, 2010, Josephs received a lengthy demand from George's attorney to

hold in trust the full commission G2 claimed it was entitled under the Asset Recovery

Agreement with its clients.  (Exh. 1021).  George's counsel informed Josephs that he

believed that it would amount to a violation of the firm's ethical duties as an officer of the

court to willfully distribute the funds to his client in disregard of G2's claims. (*Id.*)

In May of 2010, Plaintiff filed this action against G2 and its partners in state court

as a "first strike" at resolving the fee dispute. Defendants removed to this Court in

August, 2010 (Dkt. 1), and filed a Counter-claim. (Dkt. 66). During discovery, Josephs

produced the Disputed E-mail exchanged dated May 26 & 27, 2008, to Morningstar.

Defendants contend they were unaware that the Disputed E-mail existed until Plaintiff's

counsel presented it during George's deposition.

Defendants claim that the Disputed E-mail is an attorney-client communication, or

otherwise protected by the work product doctrine. Defendants seek a protective order

against the use of the E-mail in this litigation. Plaintiff's object, and seek further

discovery on the contents of the E-mail.

## B. Discussion

Rule 501 of the Federal Rules of Evidence indicates that questions of

attorney-client privilege in a diversity case are resolved under state law. Fed.R.Evid. 501.

The Rule, however, does not guide as to which state law should apply. The Ninth Circuit

provides some guidance on this issue in *KL Group v. Case, Kay & Lynch*, 829 F.2d 909

(9th Cir. 1987):

> Commentators have suggested several methods for resolving this choice of law
> issue: (1) Assume that the state "which supplies the rule of decision" is the state
> which also supplies the privilege law; (2) apply the privilege rules of the state in
> which the federal court sits; or (3) apply the conflict of law doctrine of the state in
> which the federal court sits. *See* 23 C. Wright & K. Graham, Jr., Federal Practice
> and Procedure § 5435, at 865-69 (1980); 2 J. Weinstein & M. Berger, Weinstein's
> Evidence ¶ 501[02], at 501-22 (1986).

*KL Group v. Case, Kay & Lynch*, 829 F.2d 909, 918 (9th Cir. 1987).

The parties in this case have agreed generally that under this precedent, Idaho law would apply to the determination of whether or not the attorney-client privilege existed between George and/or G2 and attorney Josephs.[2]  The Court will therefore apply Idaho law.

Recently, this Court noted that "[i]n determining whether an attorney-client relationship exists, one must look to the putative client's 'subjective belief, which [must be] reasonable under the circumstances,' or to 'assent by both the putative client and attorney.'" *Swenden v. Corey*, 2011 WL 1458441, *3 (D. Idaho 2011), (quoting *Warner v. Stewart*, 129 Idaho 588, 930 P.2d 1030, 1035 (Idaho 1997)). *Accord Dean v. Dean,* 607 So.2d 494, 497 (Fla. App. 1992) (noting privilege founded on subjective considerations and focusing on subjective intent of the client and not what the lawyer does.) The burden of showing that a privilege applies is on the party asserting the privilege.  *Kirk v. Ford Motor Co.*, 116 P.3d 27, 34 (Idaho 2005).

In this case, it is only the putative client's subjective belief that is at issue. There is no evidence "of assent by both the putative client and attorney" for an attorney-client relationship between the law firm of Josephs Jack or Josephs himself and G2 or Henry

_____

[2]Previously Plaintiff argued that Florida law applied, but states that *K.L. Group v. Case, Kay & Lynch*, 829 F.2d 909, 918 (9th Cir. 1987), is "fairly straightforward pointing to the use of Idaho law." (Dkt. 94, p. 2).  Defendants engage in a conflicts of law analysis under Idaho law, arguing that Florida and Idaho law does not conflict on the issue of the attorney-client privilege, and then maintain that the privilege is evaluated under Idaho law.  (Dkt. 95, pp. 1-2).

George.  Indeed, the evidence is to the contrary; Josephs, both in writing and verbally, repeatedly disavowed any attorney-client relationship with either G2 or Henry George.

Josephs does not deny, however, that he instructed George to take certain actions related to the ongoing legal proceedings on occasion.  George contends the instructions he received from Josephs constituted legal advice upon which he relied, and that formed his subjective belief that Josephs was his attorney.  Accordingly, the Court must decide on the evidence whether or not George's subjective belief that he had an attorney-client relationship with Josephs was reasonable. *Warner,* 930 P.2d at 1035.

**1.      Evidence of reasonable, subjective belief in attorney-client relationship.**

George claims that he sought and received legal advice from Josephs on three personal matters: (1) the dispute with his G2 business partner, (2) the application for his post-petition fees, and (3) the Asset Recovery Agreement dispute against Morningstar.

George contends he asked Josephs for personal legal advice regarding the business dispute with Douglas and that, in response, Josephs told him to convince Douglas to arbitrate the fee issue with Morningstar and outlined the reasons why they should should settle with Morningstar.  He contends that he in reliance on Josephs' legal advice to him, he set forth the discussion in the Disputed E-mail to Douglas, and asked Josephs for his legal opinion on the e-mail.  Having received confirmation that the e-mail 'made a compelling argument', George sent the Disputed E-mail to Douglas.  (Trns. at 42 - 43).

Josephs does not dispute that he spoke to George about the issues set forth in the

Disputed E-mail to Douglas. He explains, however, that in that discussion he was acting in his capacity as Morningstar's attorney and was attempting to persuade George to privately arbitrate the Asset Recovery Agreement dispute in exchange for his client, Morningstar's, agreement not to object to George's post-petition fee application. (Trns. at 83 - 86).

The Court finds Josephs' description of the circumstances surrounding the Disputed E-mail more credible and supported by the record. The Court further finds that George could not have reasonably believed that Josephs was acting as *his attorney* negotiating an agreement that would be adverse to Josephs' client, Morningstar.

In that vein, the Court wholly rejects any suggestion that Josephs was acting as an attorney for G2 as against Morningstar or other clients regarding the Asset Recovery Agreement. The record is clear that George was clearly advised that Josephs represented Morningstar and would not undertake any action that was adverse to that client without their consent. It is equally clear that George understood this fact, and also understood the concept of a conflict of interest and adversity. It is clear from the record that, in discussions about the fee dispute, George understood that Josephs was acting as the attorney for the Josephs Jack Ad Hoc Committee, and not George or G2. The Court concludes that under the circumstances, George did not have a reasonable subjective belief that Josephs was acting as *his attorney* in any discussion regarding the fee dispute with Morningstar.

ORDER - 16

George claims, however, that although he understood that certain actions he asked

Josephs to take on his behalf created a conflict of interest for Josephs, he expected

Josephs to tell him if he could not give advice on a matter due to a conflict, and assumed

there was no conflict if Josephs gave him any advice.  The gravamen of his position is, "I

asked Josephs opinions, he gave them to me, I relied on them, and I did what he told me

to do. Ergo, he was my attorney."  The Court believes that more was required under the

circumstances to form a reasonable belief that Josephs represented him, particularly in the

context of negotiating various issue that were obviously adverse to Morningstar, who was

clearly Josephs' client.

The Court does not find credible George's testimony that he reasonably,

subjectively believed that Josephs was acting as his attorney in discussing the fee dispute

with Morningstar.  There is no evidence in the record that George even held the

subjective belief that Josephs was his attorney.  There are several examples in the record

raising doubt as to the credibility of George's testimony on these issues. First, George

testified that Josephs represented *him* in the filing of his post-petition fee application and

advocated on his behalf, as his attorney, during the hearing on the application. (Trns. at

24).  The record is clear that the original fee application Josephs Jack submitted for

George, and later withdrew, was submitted by Josephs in his capacity as the attorney for

and on behalf of the Josephs Jack Ad Hoc Committee, and not as the attorney for G2 or

Henry George.   The *Committee* filed the fee application requesting that George get paid.

After learning of Douglas's claims of fraud in the fee application, Josephs withdrew the Committee's application and informed George that he would have to have his *own* attorney file the application.

The fact that Josephs was not representing G2 or George in the fee application is equally clear from the transcript of that hearing. Josephs clearly made his appearance for the Ad Hoc Committee, clearly stated on the record – in George's presence – that he did not represent G2 or George, but that he supported the application. In fact, he expressly bolstered his credibility in support of the fee application on the basis that he represented adverse parties who would receive less money from the bankruptcy estate if the fee application was paid.

George's credibility is also called into question by his failure to acknowledge that: (1) Josephs withdrew the fee application filed by the Committee on behalf of George once Rich Douglas made the fraud claims in objection to the application, and (2) Josephs told George he would have to get his own attorney to pursue the application. Likewise, notwithstanding numerous hostile and ranting e-mails sent to Josephs complaining about the fee situation and Josephs' position on filing the application, he never once contemporaneously accused him of failing to act appropriately *as his attorney*. The only evidence in the record that George believed that Josephs was acting as his attorney during that time period are his fairly recent, self-serving statements.

The court finds, based on the evidence presented, that Defendants have not met

their burden of establishing that an attorney-client relationship existed between George and Josephs. The record shows that it is questionable that George held such a belief, and that, if he did, such a belief was unreasonable under the circumstances.

### 2.     Waiver

The Court further finds that even if the Disputed E-Mail constituted a privileged communication, the privilege was waived. George testified that Josephs' advice regarding how to handle the business dispute between he and his partner was personal advice to him based on his concern about being sued. Thus, George, rather than G2, was the client. When George sent that e-mail to an adverse party, Douglas, any privilege – including rights under the work product doctrine – was waived.

### 3.     Work Product Privilege

The Court also finds that there is no basis in the record to conclude that the contents of the Disputed E-mail constituted work product. Defendants argue that the work-product doctrine applies because the contents of the E-mail sent to Douglas were Josephs' mental impressions and legal advice to G2 in preparation for litigation about the Asset Recovery Agreement dispute with Morningstar. As discussed above, the Court finds that the record does not support that Josephs gave legal advice to George concerning the fee dispute with Morningstar.

### 4.     Common Interest Exception

Likewise, even if Josephs is deemed to have given legal advice to George personally

regarding arbitrating the dispute with Morningstar to minimize the potential of jeopardizing the action against Bank of America, the Court finds that it would fall under the common interest exception to the attorney-client privilege. In a pleading G2 filed with the bankruptcy court on June 20, 2011, on the issue of the attorney client privilege between Josephs Jack and G2 and/or Henry George, G2 describes the alleged formation of the attorney client relationship in a somewhat misleading manner – suggesting that Josephs Jack represented G2 independently in "matters unrelated to the bankruptcy" and then retained Josephs Jack to represent G2s clients. However, he also states that G2 believed the "dual representation" was favorable to both sets of clients because of their common interest in the result of the representation – "catch the bad guys, and find and recover funds." *(See Supplemental Filing*, "G2, LLC's Motion to Abstain from Josephs Jack's Motion for Order of Instructions Evidentiary Hearing Requested," Dkt. 113, p. 9). This appears to fall squarely within the common interest exception codified in both Idaho and Florida. *See* I.R.E. 502(d)(5); Fla. St. Ann. § 90.502.

## CONCLUSION

For the foregoing reasons, the Court finds that the Disputed E-mail is not protected by the attorney-client privilege or the work product doctrine, and is subject to disclosure and discovery in this action. For the same reasons, the Court finds that there is no legitimate need to keep the proceedings held in camera sealed, and will order them unsealed.

**ORDER**

Consistent with the foregoing Memorandum Decision and Order, Plaintiff's

Motion for Discovery (Dkt. 77) is GRANTED, and Defendants' Motion for Protective

Order (Dkt. 82) is DENIED.

DATED: **October 4, 2011**



Honorable B. Lynn Winmill
Chief U. S. District Judge