UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MORNINGSTAR HOLDING CORPORATION, a Foreign Corporation qualified to do business in Idaho,<br><br>              Plaintiff,<br><br>     v.<br><br>G2, LLC, a California Limited Liability Company, HENRY GEORGE A/K/A JOHN DOE I, and RICH DOUGLAS A/K/A JOHN DOE II, individually, and as Partners or Members of a Joint Venture,<br><br>              Defendants. | Case No. CV-10-439-BLW<br><br><br>**MEMORANDUM DECISION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. 88), DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 96), G2's MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIMS (Dkt. 98), MOTION TO DISMISS (Dkt. 91) and MOTION FOR LEAVE TO AMEND (Dkt. 106).** |

The Court has before it Plaintiff's Motion for Partial Summary Judgment, Defendants' Motion for Summary Judgment, G2's Motion for Summary Judgment on its counter-claims, a motion to dismiss the non-appearing individual defendant, a motion for leave to amend the counter-claim to add a claim for punitive damages, and several evidentiary motions. The Court heard oral argument on October 5, 2011, and took the matters under advisement. After further review, the Court issues the following

Memorandum Decision and Order denying both Plaintiff's motion for partial summary and the Defendants' cross motions with respect to Plaintiff's and Defendant G2's contract claims/counter-claims, granting Defendants' motion for summary judgment on Plaintiff's breach of fiduciary duty and negligence claims, and denying Defendants' motion to dismiss Rich Douglas.

## MOTIONS FOR SUMMARY JUDGMENT

**A.     Background**

Plaintiff Morningstar invested and lost approximately $2,000,000 in a fraudulent high-yield investment scheme operated by an individual doing business as Sentinel Funds, Inc., Sentinel Holdings Corporation and Sentinel Partners, Ltd. (hereafter "Sentinel Scam").  Beginning as early as 2005, Defendant G2, through its principal partners – Defendants George Goldsmith a/k/a Henry George and Rich Douglas a/k/a Rich Gurnett – was retained to recover the losses experienced by other victims of the Sentinel Scam.   An agent with the FBI referred Morningstar to G2, and the two entities entered into an Asset Recovery Agreement (ARA) in August of 2005. (*See* Dkt. 88-2, p. 31)

Hal McNee, president of Morningstar, negotiated the ARA primarily with Rich Douglas. One point of negotiation was G2's payment.  At the time of retention, G2 anticipated an imminent recovery of the funds through settlement negotiations with Bank

of America.[1]  The ARA required Morningstar to pay G2 a 50% "Success Commission" on any recovery "returned or obtained by any other method through our sources and methods." *Id.*  Other victims who had contracted with G2 earlier in the investigation would pay only a 20% Success Commission.  This discrepancy was to account for the fact that the other victims (an "Original Claimant" and "Secondary Claimants") had paid the costs and expenses of G2's investigation and recovery efforts.  The ARA also required that the claims of the these other victims would be prioritized making Morningstar a "Tertiary Claimant." (Dkt. 88-2, p. 31).

McNee expressed concern about the 50% commission, which he considered "exorbitant," but felt time-pressured to sign the agreement so that Morningstar could participate in the settlement that was perceived to be imminent.  He claims that Rich Douglas assured him that G2 would fairly resolve his concerns later.

Negotiations with Bank of America failed, however, and G2 determined that Morningstar and the other victims would need to hire attorneys to pursue their losses through legal proceedings – including filing a claim in the Sentinel bankruptcy proceeding and a civil lawsuit against Bank of America. Using a Power of Attorney Morningstar signed as required by the ARA, G2 hired separate counsel for the two proceedings and advanced Morningstar's pro-rata cost of their respective retainers.  G2

_____

[1]Bank of America's involvement in the Sentinel Scam is not entirely clear from the record. It appears, though, that acting as Fleet Investment Bank, Bank of America held the funds that were lost through a fraudulent transfer.

informed Morningstar that it would need to reimburse G2 for these expenses.

Morningstar objected to paying the legal fees without renegotiating the other issues of concern, including the 50% commission. When Morningstar refused to pay the legal fees, G2 indicated that it would demote Morningstar to a "sub-tertiary" claimant. Simultaneously, various disputes arose among G2, Morningstar, and G2's other clients. Initially, the representation agreement with the civil litigation attorney, Michael Josephs of the Joseph Jacks law firm, designated G2 as the representative of its clients to act as the liason between Josephs and the victims. The relationship proved unworkable, however, given the ongoing disputes, and Morningstar – along with other victims – retained the attorneys directly, removing G2 as the "middle-man," and subsequently gave G2 notice of termination of the ARA.

Morningstar received a settlement in both proceedings, and ultimately recovered more than its original investment, less 30% in attorney's fee commissions. G2 received payment of $65,000 through the bankruptcy proceeding, but has not received any payment from Morningstar, and maintains that it was entitled to its 50% commission of the recovery based on the ARA.

Morningstar, on the other hand, contends that its recovery was not the result of G2's efforts, but the work of the attorneys hired to represent Morningstar in the legal proceedings. Accordingly, and for other reasons, Morningstar contends that G2 is not entitled to receive its full 50% commission. Morningstar filed this action alleging that G2

and its principals committed fraud, made intentional and negligent misrepresentations, breached its fiduciary duty to Morningstar, and breached the terms of the ARA. (*Amended Complaint,* Dkt. 9). Douglas has not been served or otherwise appeared in this action. G2 counter-claimed for breach of the ARA seeking payment of its commission, or alternatively, for the value of its services under an unjust enrichment claim. (*Answer to Amended Complaint and Counterclaim*, Dkt. 52).

Morningstar now moves for partial summary judgment on all claims related to breach of contract. Defendants cross-move for summary judgment on these claims, as well as the remainder of Morningstar's claims. G2 moves for summary judgment on its Counter-claims and Morningstar's affirmative defenses to its counter-claims.

**B.     Summary Judgment Legal Standard**

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings. *Id.* Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the issue on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists.

*Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir.2002); *see also* Fed.R.Civ.P. 56(e). In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

In order to preserve a hearsay objection, "a party must either move to strike the affidavit or otherwise lodge an objection with the district court." *Pfingston v. Ronan Engineering Co.,* 284 F.3d 999, 1003 (9th Cir. 2002). In the absence of objection, the Court may consider hearsay evidence. *Skillsky v. Lucky Stores, Inc.,* 893 F.2d 1088, 1094

(9th Cir. 1990).

**C.      Contract Claims**

Morningstar moves for partial summary judgment on its claim for breach of

contract supporting rescission and G2's counter-claim for breach of contract seeking

payment pursuant to the contract terms.  Morningstar contends that (1) the ARA is

unenforceable as a matter of law, and (2) G2's unilateral subrogation of its claims to the

"sub-tertiary" prioritization category was a material breach of the contract which entitled

Morningstar to rescind the contract.

Defendant G2, on the other hand, moves for summary judgment on its counter-

claim for breach of contract claiming that there are no genuine issues of fact in dispute

preventing the Court from finding that Morningstar breached the ARA by failing to pay

G2 its commission.   Because it involves the pivotal question of what the parties agreed to

in the ARA, the Court will first address Defendants' motion for summary judgment on

breach of contract, and then the remaining contract issues.  As explained below, the

motions will be denied.

**1.      There are disputed issues of material fact regarding the meaning of the ARA and whether G2 is entitled to a commission based upon Morningstar's recovery.**

Defendants claim that all of the pivotal facts regarding liability under the ARA are

undisputed:  G2 was authorized to take whatever action was necessary for the recovery

efforts, including hiring the attorneys to file lawsuits on behalf of the clients; that the

clients – including Morningstar – would be responsible for paying these legal fees in addition to G2's commission;  G2 is entitled to its commission from any recovery obtained through any of its sources; G2 – on behalf of Morningstar by virtue of the Power of Attorney granted in conjunction with the ARA –  instituted the legal proceedings that ultimately resulted in Morningstar's recovery; and G2 has not been paid its commission. The Court disagrees and finds disputed questions of material fact precluding summary judgment in G2's favor.  Specifically, the Court believes that the ARA is ambiguous in several respects which preclude a finding that G2 is entitled to payment under its terms.

Where its language is clear and unambiguous, the meaning and legal effect of a contract is a matter of law for the Court to decide from the plain meaning of the contract's words.  *See Pinehaven Planning Bd. v. Brooks,* 70 P.3d 664, 667 (Idaho 2003). On the other hand, if a contract is ambiguous, the meaning and legal effect of the contract is a question of fact which may be determined from extrinsic facts.  *See Albee v. Judy*, 31 P.3d 248, 252 (Idaho 2001).  It is only if the extrinsic evidence of the parties' intent is not conflicting, that the court may determine the parties' intended meaning of the ambiguous terms from such evidence.  *See Jensen v. Westberg*, 707 P.2d 490, 492 (Idaho Ct. App. 1985).   Otherwise, the parties' intent is generally a question of fact reserved for the jury. *See id.; Albee*, 31 P.3d at 252.

The determination of whether a contract is ambiguous is a question of law for the court to decide. *Pinehaven Planning Bd.,* 70 P.3d at 667. A contract is ambiguous if it is

subject to reasonable but conflicting interpretations, or is nonsensical. *Swanson v. Beco Const. Co.*, 175 P.3d 748, 751 (2007)(citations omitted).

The basic terms of the ARA were as follows. G2 was to perform the following "Deliverables":

(1)  Continue with investigation.
(2)  Continue to coordinate closely with law enforcement authorities to manage ongoing criminal investigation to the fullest benefit of G2's clients, both original, secondary and tertiary.
(3)  Discuss and negotiate settlement terms and conditions with individuals and institutions.
(4)  Respond appropriately to unexpected developments, some of which may require additional travel, expenses, action on the part of G2 or it clients.

ARA, p. 2, § 4 (Dkt. 88-2, p. 31).

Morningstar was to pay "expenses," defined as "all modes of transportation, lodging, meals, telecommunications, office and courier, computer and other electronic support *and any and all expenses which can be reasonably related to the recovery effort,*" *Id.*, p. 2, § 3(e) (emphasis added); and, a "Success Commission" defined as 50% "of any and all of the Claim Amount recovered and/or returned or obtained by any other method through our sources and methods to the Claimant after the execution date of this Agreement." *Id.*, p. 2.

Broadly speaking, the language of the ARA is so vague that it defies any clear understanding of what the parties intended – and is therefore susceptible to conflicting interpretations. For example, with respect to G2's Deliverables, substantial questions arise: What will the promised "investigation" entail? What is the purpose and nature of

the continued "coordination" with law enforcement?   What metrics will be used to

measure success in "discussing and negotiating" settlement terms?  What is an

"appropriate response" to unexpected developments? The same is true with respect to

Morningstar's payment obligations: What standard would be used to determine which

expenses are "reasonably related" to the recovery effort?   What is the "recovery effort"?

What will be included in G2's "sources and methods?"   How does one differentiate

between amounts recovered from other sources, including attorneys retained directly by

Morningstar, and those recovered from G2's "sources and methods?"

The Court concludes that the numerous unresolved issues concerning the parties'

obligations are so substantial that it is impossible to view the ARA as anything but vague

and ambiguous.

In addition to the inherent ambiguity of the language used in the ARA, there are

specific examples of uncertainty.  For example, the scope of G2's recovery effort is

clearly susceptible to more than one interpretation.  On the one hand, there is broad

language in the ARA that implies that the recovery could include other "unforseen

methods" and involve additional, non-specified expenses which could include legal fees.

On the other hand, there are several provisions and communications suggesting that the

parties thought that the "recovery" would be the result of either the negotiation of a

settlement, or collection of assets through restitution in the ongoing criminal proceedings

– and that no other method was truly contemplated. The ARA mentions both negotiation

and restitution in a few places, while remaining silent on any other method including filing additional lawsuits. Specifically, for example, it addresses G2's entitlement to a Success Commission if recovery resulted from Restitution following arrests or convictions, versus direct negotiations, *Id.,* p. 32, making no mention of any other methods of recovery, including litigation.

Another example is Exhibit A to the ARA, which is a status update as of June 2005, incorporated into and made part of the agreement. In that update, Goldsmith describes Morningstar and others as "second stage" victims joining the "last phase of the investigation and recovery."(ARA, Exh. A, Status of Recovery as of June 1, 2005. Dkt. 88-2, p. 36.) His description lends credence to the view that, at the time Morningstar agreed to the ARA, no one contemplated filing lawsuits.

In addition, once the Court concludes that the ARA itself is ambiguous and examines the extrinsic evidence, it is clear there are disputed issues of fact as to whether the parties had a meeting of the minds concerning attorney fees. Several communications from G2 suggest that litigation or corresponding legal fees were not anticipated. For example, in February 2006, when G2 informed the clients that attorneys would in fact need to be hired, it also addressed requesting legal fees from its "tertiary" clients including Morningstar:

> To our "Tertiary Clients": Because you joined our group late in the investigation (through no fault of your own) or because you were financially unable to contribute to our retainer for hours and expenses, we must ask that you contribute to the legal fund referred to above. Although we could not possibly anticipate

> requiring legal fees from your group when we drafted your agreement it is
> unreasonable and unfair to expect our initial client and our secondary clients to
> fund this expense for you.

*Id.*, Update February 6, 2006 (Dkt. 88-2, at p. 48).

Even if the Court assumes that Morningstar agreed to such expenses under the ARA, there remain disputed issues of fact as to whether all or part of Morningstar's recovery was the "result of" G2's efforts or independent efforts by Josephs and the bankruptcy attorneys.

In summary, the Court believes that the ARA is ambiguous as to whether the parties intended that G2's recovery efforts would include filing additional lawsuits and whether legal fees incurred in the pursuit of such litigation would be a client-borne expense. The Court also finds that whether G2 is entitled to its commission from all or part of Morningstar's recovery involves disputed questions of fact as to how the recovery "resulted." Because of these disputed questions of fact, Defendant's motion for summary judgment will be denied.

**2.      The ARA is not Unenforceable Because of Illegality or Contravention of Public Policy.**

Plaintiff argues that the contract is void and unenforceable on the grounds of illegality and contravention of public policy because Defendants (1) were hired to be investigators without the required licenses, and (2) engaged in the unauthorized practice

of law.[2]

"Whether a contract is illegal is a question of law for the Court to determine from all the facts and circumstances of each case." *Trees v. Kersey*, 56 P.3d 765, 760 (Idaho 2002) (citation omitted)  An illegal contract is one based on illegal consideration consisting of any act or forbearance furthering any matter of thing prohibited by statute." *Id.* (citation omitted).

### a.    Unlicensed private investigators

Morningstar argues that because both Florida and California prohibit conducting private investigation without a license, and neither Goldsmith or Douglas are licensed private investigators, the ARA's purpose is illegal, and therefore void.

Florida Statute Annotated § 493.6101 defines "private investigation" as the investigation into:

> (a) Crime or wrongs done or threatened against the United States or any state or territory of the United States, when operating under express written authority of the governmental official responsible for authorizing such investigation.
>
> (b) The identity, habits, conduct, movements, whereabouts, affiliations, associations, transactions, reputation, or character of any society, person, or group of persons.

---

[2]Morningstar made several requests that the Court "take judicial notice" of all of the files and records in this case in consideration of the pending motions.  The Court denies this request.  The Court will not comb through the entire record to ascertain if questions of fact exist.  *See Carmen,* 237 F.3d at 1029; *Southern California Gas Co.*, 336 F.3d at 889.

(c) The credibility of witnesses or other persons.

(d) The whereabouts of missing persons, owners of unclaimed property or escheated property, or heirs to estates.

(e) The location or recovery of lost or stolen property.

(f) The causes and origin of, or responsibility for, fires, libels, slanders, losses, accidents, damage, or injuries to real or personal property.

(g) The business of securing evidence to be used before investigating committees or boards of award or arbitration or in the trial of civil or criminal cases and the preparation therefor.

The California statute is nearly identical. *See* West's Ann. Cal. Bus. & Prof. Code § 7521.

By its express terms, G2 was to receive compensation for successfully recovering Morningstar's assets in the form of money from specific known entities, which is more akin to "debt collection" than the more traditional investigative activities described above. In any event, Plaintiff has failed to come forward with evidence establishing that Defendants conducted the activities described in the statute which would constitute private investigation, where any activity took place, or whether or not Defendants would have been required to be licensed for the particular activity. The Court agrees that simply advertising investigative services, or using the term "investigate" in the ARA and communications is not sufficient to establish that the statute has been satisfied.

Moreover, the Florida Act specifically exempts from the definition of a "private investigator" an individual who "on a one-time or limited basis, as a result of a unique

expertise, ability, vocation, or special access and who, under the direction and control of a

Class "C" licensee or a Class "MA" licensee, provides information or services that would

otherwise be included in the definition of private investigation." F.S.A. § 493.6101(16).

The un-controverted evidence in the record is that Defendants possessed unique expertise,

were hired to recover funds, but in the process acquired information that aided the

investigation of the fraud scheme, and retained properly licensed investigators to work

with when required. *See G2 SOF,* (Dkt. 118), ¶ 12; *Affidavit by George Goldsmith in*

*Opposition to Morningstar's Motion for Summary Judgement Dated 8/1/11,* (Dkt. 120),

¶¶ 6 -8. Even if Defendants performed some otherwise investigative tasks, it appears that

the exception would apply, or at least there are questions of fact on this record.[3]

Finally, the briefing and supporting evidence does not address which law applies

to the contract action. The parties have previously argued and cited Idaho law, though no

decision has been rendered on this issue. Without facts to determine which state law

applies, the record is insufficient to determine whether that State's public policy or law is

violated by unlicensed conduct. Idaho does not require private investigators to be

licensed. Assuming Idaho law applies to the contract, then the California or Florida

private investigation statutes would not be relevant in determining whether the contract is

void for violating Idaho law or public policy.

---

[3]The Court has considered the evidence submitted with Plaintiff's Request to
Augment the Record (Dkt. 129). The motion will be granted.

For these reasons, the Court finds that the record is not sufficient to support a claim that Defendants were engaged in unlicensed investigative services.

### b. Unauthorized practice of law

Morningstar claims that Defendants engaged in the unauthorized practice of law by conducting legal research, drafting a legal document (a witness statement in the form of an "affidavit") and a release, filing complaints with financial regulatory agencies, and engaging in negotiations on behalf of G2's clients.

Morningstar failed to submit evidence or point to facts in the record supporting many of its factual assertions. The record contains no evidence of specific legal research. Instead, Plaintiff points to G2 communications either offering knowledge of legal issues or referencing generally that G2 had done legal research. *See* PSOF, B.1. G2 submits Goldsmith's testimony, by affidavit and in deposition, disputing that Defendants conducted any legal research or gave any legal advice. He explains that where G2 offers legal research as an expertise, G2 is referring to its "network of professionals in a variety of fields." G2 SOF, ¶ 10. He also explains that "the legal research" referenced in particular correspondence was either G2 reading legal cases as part of its own due diligence, or consulting attorneys on relevant legal issues and then passing that information on to G2's clients. PSOF, ¶¶ 10, 11, 13 - 18. G2 explains that the witness statements were provided to prosecuting agencies and attorneys for background information in their work, and the release was drafted by a law firm. PSOF, ¶ 19-24.

Plaintiff has failed to come forward with sufficient evidence establishing that Defendants' themselves engaged in the unauthorized practice of law, or to refute Defendants' evidence that attorneys were consulted and relied upon for any relevant legal issues.

Further, the court has reviewed the cases Plaintiff cites in support of its argument and finds them distinguishable in that they involve conduct more akin to the traditional role of an attorney – providing legal counsel and advice, appearing in proceedings and preparing legal documents which have legal ramifications – than the debt collection activities and negotiations Defendants undertook. *See Drake v. Superior Court,* 26 Cal. Rptr.2d 829 (1994) (Attorney in fact sought stay in court on behalf of principal); *In re Jackman*, 761 A.2d 1103 (N. J. 2000) (Out-of-state attorney worked in law firm, counseled clients, prepared non-court filings, and negotiated merger and acquisition); *Florida Bar v. Neiman*, 816 So.2d 587 (Fla. 2002) (Paralegal held himself out as an attorney, argued and advocated clients positions on legal issues, provided legal advice to clients).

Finally, the Court agrees that what constitutes the unauthorized practice of law in Florida or Idaho is more appropriately determined by the Supreme Court of the respective state. *See Idaho State Bar Ass'n v. Idaho Public Utilities Commission*, 637 P.2d 1168 (Idaho 1981); *Goldery v. Merrill Lynch Credit Corp.*, 35 So.3d 905, 906 (Fla. 2010). Plaintiff has not shown that the Supreme Courts of Idaho or Florida have made the

determination that the facts alleged in this case constitute the unauthorized practice of law.

For these reasons, Plaintiff's motion based on the allegation that Defendants engaged in the unauthorized practice of law will be denied.

### 3.    Unilateral Modification

Plaintiff also argues that G2's attempt to unilaterally modify the terms of the ARA by relegating Morningstar to the "sub-tertiary investor" category was a material breach of the contract justifying Morningstar's termination of the contract as a matter of law, and judgment in its favor for breach of contract and for G2's counter-claim for breach of contract.  The Court disagrees.   Whether G2's attempt to unilaterally demote Morningstar to "sub-tertiary" status in G2's collection efforts violated the ARA involves questions of fact which are in dispute.

First, generally, "whether a breach of contract is material is a question of fact." *Independence Lead Mines v. Hecla Mining Co.*, 137 P.3d 409, 415 (Idaho 2006) (citation omitted).  No evidence has been presented on materiality.

Second, G2 submits an affidavit by Goldsmith that G2 only proposed that Morningstar be relegated to a "sub-tertiary" claimant, which Morningstar rejected. Accordingly, the proposal had no effect and caused no damage.  McNee disagrees in his affidavit, and states that the demotion was presented as  "Fait accompli," and that Morningstar had no choice.  Accordingly, it was a breach of the agreement and not

simply a rejected attempt to modify the agreement.

It is undisputed that G2 sought to convert Morningstar to a "sub-tertiary investor" and suggested that it could do so unilaterally.   However, it is also undisputed that G2 is not attempting to enforce the terms which it attempted to add to the ARA.  Likewise, it is undisputed that Morningstar never treated Morningstar as a sub-tertiary investor in a way that violated the original contract terms.  Thus, Morningstar has not suffered any injury as a result of G2's actions.

Morningstar claims this is irrelevant because G2's breach supports its claim for rescission.  However, the Court is not persuaded that rescission is a viable remedy in this action.  First, the right to rescind is waived where a party continues to treat the contract as valid after grounds for rescission arise. *See White v. Mock*, 104 P.3d 356, 362 (Idaho 2004) (citation omitted).  McNee received notice of G2's intent to demote Morningstar to a "sub-category of non-contributing tertiary investors" on February 27, 2006. *McNee Affix.*, Dkt 27-3, ¶ 8.He received further notice that G2 considered Morningstar in the subordinated category on March 1, 2006. *Id.*  He then communicated a willingness to contribute legal fees contingent on certain conditions, to which he never received a response. *Id.* at ¶ 9.

In the meantime, G2 proceeded to hire the attorneys for both the bankruptcy and civil legal proceedings and advance the costs of Morningstar's share of the legal costs. (*See id.* ¶¶ 9 - 10).  Although the extent of G2's contribution or participation in these

proceedings is disputed, they nonetheless continued for over two years before

Morningstar revoked the Power of Attorney and gave notice of termination of the Asset

Recovery Agreement, in August 2008. (*Id.*)   It is also unlikely that status quo could be

restored – a requirement of rescission – under these facts.  *See White*, 104 P.3d at 362.

The Court finds disputed questions of fact regarding the claim for rescission, and

therefore denies both Plaintiff's motion for summary judgment and Defendants' cross-

motion for summary judgment on this claim.

**D.     Henry George's Personal Liability**

Plaintiff argues that Henry George should be personally liable for G2's conduct

and not be allowed the protection of the G2 corporate veil because the California state

corporate filings list him by his pseudonym in violation of the California Penal Code

section criminalizing false filings.  Cal. Penal Code, § 115(a).  The Court is unpersuaded

and finds that Plaintiff has not set forth a factual or legal basis justifying a judgment that

G2's liability be imposed against Henry George personally.  *See Shoaxing County Huayue*

*Import & Export v. Bhaumik*, 120 Cal.Rptr.3d 303, 309-310 (Ct. App. 2011) (*citing*

*Sonora Diamond Corp. v. Superior Court*, 99 Cal. Rptr.2d 824 (2000)) (California alter

ego doctrine requires that there be "such a unity of interest and ownership between the

corporation and its equitable owner that the separate personalities of the corporation and

the shareholder do not in reality exist. . . .[and] an inequitable result if the acts in question

are treated as those of the corporation alone.")

## E. Plaintiff's Negligence and Breach of Fiduciary Duty Claims

Defendants have moved for summary judgment on Plaintiff's claim that Defendants breached their fiduciary duty and were negligent in allowing the expiration of the statute of limitations for a claim under the Florida Securities & Investor Protection Act ("FSIPA") which, if successful, would have entitled Plaintiff to collect mandatory attorney fees in the civil action against Bank of America. Defendants have also moved for summary judgment on Plaintiff's claim that Defendants breached their fiduciary duty by requiring Plaintiff to pay a pro-rata share of legal expenses for the Florida bankruptcy and civil actions, and unilaterally demoting Plaintiff to a sub-tertiary status claimant.

### 1. FSIPA Claim

Plaintiff's sole claim for monetary damages in this action is for $800,000 based on Defendants' negligence or breach of fiduciary duty that caused Plaintiff to lose the opportunity to file the FSIPA claim and thereby receive a mandatory award of attorney fees. Plaintiff contends that it lost money either because it would have successfully pursued the claim and been entitled to mandatory attorney fees, or because the existence of the claim would have resulted in a higher settlement with Bank of America. The Court agrees with Defendants that under either scenario, Plaintiff has failed to submit evidence to raise a genuine triable issue of fact on causation or damages on these claims. Simply put, they have done nothing to take this claim out of the realm of speculation.

It is possible that the filing of the FSIPA claim would have caused Morningstar to

forego settlement with Bank of America and that they would have been successful in that litigation. However, Plaintiff has offered nothing in the way of expert opinion or fact testimony establishing that the filing of such a claim would have resulted in the claim having been pursued to a favorable verdict. Likewise, it is possible that the filing of the FSIPA claim would have improved Morningstar's negotiating posture with Bank of America such that they would have obtained a more favorable settlement. However, Morningstar has again failed to provide expert opinion or fact testimony indicating that the lack of a FSIPA claim affected the settlement negotiations and resulted in a lower settlement.

Furthermore, Plaintiff's negligence claim based on the expiration of the FSIPA statute of limitations is barred by the statute of limitations. The Idaho statute of limitations for a negligence claim is two years, Idaho Code § 5-219(4), and begins to run when the damage is objectively ascertainable. *Blahd v. Richard B. Smith, Inc.*, 108 P.3d 996, 1002 (Idaho 2005). Plaintiff's alleged damage became objectively ascertainable the day the FSIPA statutes of limitations ran against Bank of America – October 31, 2005– and ran on October 31, 2007. This action was filed on May 4, 2010, nearly three years later. Therefore, the Plaintiff's claim that the Defendants negligently permitted the FSIPA statutes of limitation to run is barred by the applicable Idaho statute of limitations

governing negligence claims.[4]

 For the foregoing reasons, Defendants are entitled to summary judgment on Plaintiff's negligence and breach of fiduciary duty claims related to the FSIPA statute of limitations.

### 2.     Demotion to Sub-Tertiary Investor Group

Morningstar also claims that Defendants breached their fiduciary obligations when they demanded that Morningstar pay legal fees and – when Morningstar objected – demoted it to the sub-tertiary investor group.  Plaintiff learned that G2 unilaterally re-categorized Morningstar to a sub-tertiary investor category on March 1, 2006.  *McNee Affid.*, ¶ 9 (Dkt. 27-3).   Morningstar had learned even earlier, on February 6, 2006, that G2 intended to hire attorneys and demanded that Morningstar pay its pro-rata share –$33,400 – of the legal expenses (*Amend. Cmplt. Dkt.*, ¶ 11; *Sealed Affid. of Harold McNee Jr. Re: 8/29/11*, Dkt. 126, ¶ 8). Thus, by no later than March 1, 2006, Morningstar had actual knowledge regarding the demand for attorneys fees and the unilateral re-categorization to sub-tertiary status. Under Idaho's statute of limitations, Plaintiffs had

---

[4] The statute of limitations is four years for the breach of fiduciary duty claims. Idaho Code § 5-224.  *Jones v. Kootenai County Title Insur. Co.*, 873 P.2d 861, 868 (Idaho 1994).  The limitation period began to run when Morningstar knew or should have known of the breach. *DBSI/TRI v. Bender*, 948 P.2d 151, 164 (Idaho 1997).  There are disputed questions of fact as to when Plaintiff knew or should have known of the facts constituting its breach of fiduciary duty claim relating to the expiration of the statute of limitations. However, as noted above, the claim will nevertheless be dismissed on summary judgment because the Plaintiffs have wholly failed to support their claim with evidence of causation or damages.

four years to file their fiduciary duty claims. This lawsuit was not filed until May 4, 2010. Accordingly, the breach of fiduciary duty claims based on the demand for fees and the unilateral decision to demote Morningstar are time barred.

**F.        Damages/Set-Off for Bankruptcy Fees Paid to Goldsmith.**

Defendants move for summary judgment on several claims they contend are immaterial. Most are addressed above. The one remaining deals with Morningstar's claim for a set-off for fees paid to Goldsmith through the bankruptcy. Defendants contend this claim is barred by res judicata because neither the bankruptcy trustee nor the Joseph Jack Ad Hoc committee representing Morningstar's interest objected to the payment.

The record indicates that the Joseph Jacks Ad Hoc Committee and trustee did not object to the fees, in part, based on an agreement with Morningstar that by not objecting, Morningstar was not prejudicing any claims regarding the ARA dispute. The record also shows that G2 contends that the work Goldsmith was paid for was additional work not encompassed by the ARA. Thus, there are disputed issues of fact with respect to whether or not receipt of recovery on top of the fees would result in double-recovery to G2, or if Morningstar waived any right to claim set-off.

**G.        Morningstar's Affirmative Defenses**

G2 moves for summary judgment on all of Morningstar's affirmative defenses to its Counter-claim because Morningstar has not produced any admissible evidence in support of the defenses. Morningstar refers the Court to Plaintiff's Response to

Defendants' Motion for Summary Judgment with the exception of equitable affirmative defenses. The Court agrees that Morningstar failed to present evidence sufficient to maintain its Third, Fourth, Fifth, Sixth, Eighth and Ninth Defenses. The Court finds disputed questions of fact remain as to the Seventh Defense that the ARA is void or voidable, as discussed above.

## MOTION TO AMEND

Defendant G2 seeks leave to amend its counter-claim to request punitive damages, as required by Idaho Code § 6-1604.

Conduct justifying punitive damages requires "an intersection of two factors: a bad act and a bad state of mind." *See Linscott v. Ranier Nat. Life. Ins. Co.,* 606 P.2d 958, 962 (Idaho 1980). The defendant must act (1) in a manner that was an extreme deviation from reasonable standards of conduct with an understanding of – or disregard for – its likely consequences, and (2) with an extremely harmful state of mind, described variously as with malice, oppression, fraud, gross negligence, wantonness, deliberately, or willfully. *See Meyers v. Workmen's Auto Ins. Co.*, 95 P.3d 977, 983 (Idaho 2004). For a party to be entitled to amend its claims to request punitive damages, it must put forth sufficient evidence to establish "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." *See* Idaho Code § 6-1604(2).

While Idaho case law allows punitive damages in contract actions, "they are not favored in the law and therefore should be awarded only in the most compelling

circumstances; they should be awarded cautiously and within narrow limits." *Jones v. Panhandle Distributors, Inc.*, 792 P.2d 315 (1990).

**A.     Motion to Strike Hal McNee's testimony regarding discussions with Rich Douglas.**

As Defendants point out, Morningstar's opposition to the motion to amend rests largely on reported conversations Hal McNee claims he had with Rich Douglas, who is named as a co-defendant but is not yet served. Defendants argue that the statements are inadmissible hearsay and lack foundation required for their admissibility by Fed. R. Evid. 901(6).

Whether Douglas's statements are hearsay depends upon the context in which they are offered. In this motion, they are offered to explain McNee's state of mind – that is to refute that he acted with the requisite bad intent to justify a claim for punitive damages. Accordingly, in this context Douglas's statements are not offered for the truth of the matters asserted and are not hearsay. Fed. R. Evid. 801(c).

The Court also finds that the minimal foundational requirements are met for McNee's testimony of his discussions with Douglas given the context of the discussions, the contemporaneous negotiations between McNee and Douglas, and corroborating e-mail discussions. Defendants' objection based on foundation goes to the weight of the evidence not its admissibility, and is therefore denied.

**B.     Discussion of Amendment**

Defendant G2 argues that it has a reasonable likelihood of proving that Morningstar's principal, McNee, entered into the ARA solely to induce G2 to perform its services, with no intent to pay for them. The Court finds that the record is insufficient to establish a reasonable likelihood of proving such facts in support of G2's claim for punitive damages.

Defendants rely on McNee's deposition testimony arguing that he had admitted that he had no intention of paying G2's commission when he signed the contract. Entering into a contract with no intent to honor its terms will justify punitive damages. *Vista Engineering Technologies, LLC v. Premier Technology, Inc.*, 2010 WL 300426 (D. Idaho 2010); *Hansen-Rice Inc. v. Celotex Corp.*, 414 F.Supp.2d 970 (D. Idaho 2006).  However, in this instance, the record shows that although McNee indicated he had no intention of paying the full 50% commission, he did so in the context of discussions with Douglas in which McNee was pressured to sign the contract quickly, promised that the contract terms could be renegotiated, and assured that G2 "would be fair." Further, McNee only stated that he would not pay the full 50% commission, and never indicated that he would not pay G2 at all. *See, e.g., McNee Depo.*, (Dkt. 109-01), at 80, 166-69, 174-75, 191-92, 215-16, 266.  Defendants present no evidence to contradict or controvert McNee's discussions with Douglas, or state of mind or intentions when he signed the ARA or that his conduct in signing the agreement with a belief that some provisions would be renegotiated later is

an extreme deviation from reasonable standards.[5]

Instead, Defendants contend that his bad state of mind should be inferred based on other circumstances including that he is a "sophisticated" businessman who cut G2 out of the deal by retaining the Joseph Jacks law firm directly, and cancelled the ARA, when recovery was "imminent." The Court disagrees.

It is true that "[w]here evidence is conflicting, and where it can be said that if one theory of the case is correct there may be ground for the imposition of exemplary damages, the matter is properly submitted to the jury" to determine the correct theory. *Williams v. Bone*, 259 P.2d 810, 813 (Idaho 1953). Defendants arguments, however, are not evidence, and require the Court to stretch inferences beyond reason to find the necessary bad state of mind on this record. The Court has examined the evidence presented in the light most favorable to Defendant G2 as it must do, but finds that it does not rise to the level of malice, or harmful state of mind, required under the Idaho case law necessary to support an award of punitive damages. *See Cheney v. Palos Verde Inv. Corp.*, 655 P.2d 661 (Idaho 1983) (Punitive damages supported by evidence that cattle owner lied about sending payment to induce the warehouse owner to ship the cattle to a new location so that it would lose its possessory lienholder status); *Cuddy Mountain*

_____

[5]Defendants submit an affidavit by George Goldsmith stating that he does not believe Rich Douglas made the statements to Hal McNee. Goldsmith was not a party to the discussions and his testimony is not competent evidence of the content of the discussion.

*Concrete Inc. v. Citadel Const., Inc.*, 824 P.2d 151 (Idaho Ct. App. 1991) (Punitive

damages justified by evidence of malice and intentional falsification of documents.);

*Griff, Inc. v. Curry Bean Co., Inc.*, 63 P.3d 441 (Idaho 2003) (Punitive damages

supported by evidence that bean warehouse operator intended to defraud the grower by

failing to disclose that the beans were intended to cover a shortfall and that the warehouse

records had been intentionally altered to support the warehouse's position.); *Hansen-Rice,*

*Inc. v. Celotex Corp.*, 414 F.Supp.2d 970 (D. Idaho 2006) (Court granted motion to

amend to add claim for punitive damages based on statements and other evidence that

defendant had no intention of paying for contract work on buildings because he was

selling the assets); *Vista Engineering Technologies, LLC v. Premier Technology, Inc.*,

2010 WL 300426 (D. Idaho 2010) (Punitives justified based on evidence that defendant

never intended to pay for services.)

　　　Plaintiffs have pointed the Court to nothing indicating that Morningstar intended to

deprive G2 of a fair payment, or intended not to pay for the value of the services it

rendered, or even intended to short G2 unilaterally.[6] Further, the record in this case

establishes that the law firm of Josephs Jack – not Hal McNee –  terminated the original

representation agreement with G2, and renegotiated the agreement with G2's clients

---

[6]To this date, $100,000 of the settlement funds Morningstar remains in
Morningstar's attorney trust fund and the rest in an interest bearing account in
Morningstar's name for distribution upon resolution of this litigation. *McNee Affid.*
*8/29/11*, (Dkt. 126) at ¶ 14.

directly, including Morningstar. There is no evidence that this was done by Morningstar with the intent to injure G2.

Without some evidence that Morningstar's conduct was an extreme deviation from reasonable standards or of a bad state of mind, i.e., something more than a breach of contract, the Court cannot allow an amendment to the counter-claim to add punitive damages as a remedy for the breach of contract claim. *Cf. Hansen-Rice, Inc.*, 414 F.Supp.2d at 970 (D. Idaho 2006) (Specifying three pieces of evidence which supported failure to pay under contract was motivated by "unprofessional" desire "to stiff" Plaintiff and not legitimate contract dispute.)

For all of these reasons, the Court finds that G2 has/has not shown "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." *See* Idaho Code § 6-1604(2). Defendants' motion to amend will therefore be denied/granted.

## MOTION TO DISMISS

Defendants move to dismiss Rich Douglas as a defendant for lack of service. Oral argument was set to be heard along with several others on October 5, 2011. The parties did not address this motion. The Court finds, however, that argument is unnecessary to assist it in rendering its decision on the discrete issue presented.

Rich Douglas is or was a principal of Defendant G2 and Defendant George Goldsmith's partner. Plaintiff has had difficulty effecting service upon Douglas.

Plaintiff's efforts to do so are detailed in Morningstar's Notice of Results Re: Process Service on Defendant Rich Douglas a/k/a Richard Douglas Gurnett. Dkt. 50. Essentially, Plaintiff was unable to confirm that the correct person had been served and therefore was not in a position to seek default against the named defendant.

Defendants seek to have Rich Douglas dismissed as a co-defendant, without prejudice, purportedly to clean up the record as to who are legitimate parties to this action. Plaintiff argues that Defendants have no standing to bring the motion, and are making it only as a strategic attempt to suppress Douglas's testimony by having him dismissed as a party. Plaintiff fails to address whether the Court could or should dismiss Douglas as a party regardless of Defendants' standing to, or motive in, seeking the dismissal.

Fed. R. Civ. P. 4(m) provides that the Court by motion, or on its own with notice to the Plaintiff, must dismiss a defendant not served within 120 days of filing the complaint. Morningstar's objection based on standing is denied. *See id.* The Court is not inclined, however, to dismiss Defendant Douglas without further information regarding the status of Plaintiff's attempts to achieve service of process and Plaintiff's reasons for opposing his dismissal. The Court will therefore order Plaintiff to show cause why Defendant Douglas should not be dismissed without prejudice for failure to serve timely.[7]

---

[7]The Court's ultimate decision on Douglas's status, does not necessarily resolve the admissibility of Douglas's statements. His statements may, for example, be considered admissions by G2. That issue will be addressed at trial.

**CONCLUSION**

Based on the foregoing analysis, Plaintiff's Motion for Partial Summary Judgment is denied; Defendants' Motion for Summary Judgment is denied with respect to Plaintiff's breach of contract claim and Plaintiff's affirmative defense that the contract is void or voidable, but granted as to Defendants' remaining points; G2's Motion for Summary Judgment on its Counter-claim is denied; Defendants' Motion for Leave to Amend is denied; and, Defendants' Motion to Dismiss Rich Douglas is denied and Morningstar shall file a Memorandum within ten (10) ten days of this Order showing cause why the Court should not dismiss Rich Douglas without prejudice.

**ORDER**

For the foregoing reasons,

IT IS HEREBY ORDERED:

1.     Plaintiff's Motion for Partial Summary Judgment (Dkt. 88) is DENIED;

2.     Defendants' Motion to Dismiss Rich Douglas (Dkt. 91) is DENIED;

3.     Defendants' Motion for Summary Judgment (Dkt. 96) is DENIED as to Plaintiff's Claims breach of contract claim, and GRANTED and as to Plaintiff's claims for negligence and breach of fiduciary duty;

4.     G2's Motion for Summary Judgment on Counter-claims (Dkt. 98) is DENIED;

5.     Defendants' Motion for Leave to File Amended Counter-claim (Dkt. 106) is

DENIED;

6.    Defendants' Motions to Strike (Dkt. 117 & 135) are DENIED as moot;

7.    Plaintiff's Request to Augment the Record (Dkt. 129) and Motion for Consideration of Late-Filed Affidavit and Amendment to Response to Morningstar's State of Facts in Support of Motion for Partial Summary Judgment (Dkt. 145) are GRANTED.

DATED:  **January 31, 2012**

Honorable B. Lynn Winmill
Chief U. S. District Judge